Lynnette COOPER, Plaintiff,

v.

COBE LABORATORIES, INC., a Colorado corporation, Defendant.

Civ. A. No. 88–S–1587.

United States District Court, D. Colorado.

Aug. 1, 1990.

John Olsen, Boulder, Colo., for plaintiff.

Dirk Biermann, Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

SPARR, District Judge.

THIS MATTER came on for trial to the Court on June 12, 1990 on claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The Court, having heard the evidence, considered arguments of counsel, and being now sufficiently advised in the premises, enters the following Findings of Fact, Conclusions of Law, and Orders of Judgment.

### FINDINGS OF FACT

Plaintiff, Lynnette Cooper, is a female who was first employed by Defendant, COBE Laboratories, Inc. ("COBE") on November 28, 1973. COBE manufactures medical equipment and products and has its principal place of business in Colorado. COBE maintains manufacturing facilities in Arvada and Lakewood, Colorado, and in Tijuana, Mexico. Jurisdiction pursuant to Title VII of the Civil Rights Act of 1964 is conceded by the parties and is appropriate in this case.

## A. *Employment History*

Following Ms. Cooper's initial employment at COBE, she worked for approximately one and one-half years in the packaging department, followed by two years in the quality control department. She was then promoted to production supervisor. She worked in this supervisory capacity for approximately one year before she was promoted to be the first training supervisor. This was a new position which was developed and awarded to her in line with her exceptional abilities. She subsequently became a supervisor in the production department and in the plastics processing department.

The company structure was basically four-tiered: top level management, middle management, supervisors, and employees. During Ms. Cooper's fifteen years at COBE, she served under some seven or eight different managers or supervisors. Through her entire early career at COBE Laboratories, Ms. Cooper received personal evaluations which were in the "very good" category. During her supervisory tenure, Ms. Cooper supervised as many as 30 people. Up to the time that her final supervisor, Mr. Sam Wood, took over the job as plant manager, she had received no criticism of her abilities, her work habits, or of the departments which she supervised. At or about the time Mr. Wood took over the management, it became evident to Ms. Cooper that Mr. Wood was of the opinion that her department was not performing well.

During Ms. Cooper's career at COBE, very few women were in senior supervisory positions. Eight or nine were in such positions during 1978 and 1979 and approximately 18 were in such positions at the time of her termination. Plaintiff's Exhibit 69 shows that in 1987, 17 of the 18 managers were male, while 12 of the 17 supervisors were male. At the time of Ms. Cooper's discharge there had been no substantial change in this situation.

## B. *The Mexico Operation*

At a point in time which is not clear from the evidence, the company made a determination to open an operation in Mexico to manufacture disposable blood tubing sets. The plant employed Mexican national citizens as general labor, with the operation being overseen by company supervisors transferred from the company operation in Denver. During late 1986 and early 1987 Ms. Cooper was responsible for "planning" and for ordering parts utilized by COBE in the Mexican plant. Ms. Cooper was also given assignments to assist in the implementation of the materials requirements planning programs to support the Mexican operation. These assignments were in addition to Ms. Cooper's other duties as a Production and Inventory Control supervisor in the Production Inventory Control Department (PIC Department).

It was apparently determined by COBE early in 1987 that the department in which Ms. Cooper was working was not performing well. Ms. Cooper's performance was apparently also questioned. In approximately May of 1987, top level management decided to decentralize the PIC Department and move it to the Mexico plant. It was apparently decided that the job functions in that department should be transferred to Mexico. Ms. Cooper and others in her department were notified of this reorganization in May of 1987 and were advised in the summer of 1987 to seek other employment within the company. During the summer of 1987, the PIC Department was gradually dissolved and responsibilities of persons employed in that department were either eliminated or reassigned.

## C. *The Job Opportunity System*

During all times relevant to this action COBE had a policy known as the "The Job Opportunity System" ("JOS") for posting of jobs available within the company. Job openings were to be posted so that employees could consider them and apply if interested. The evidence indicates that, in reality, not all jobs were posted. In some instances, employees were pre-selected for jobs that were never posted. It was conceded by COBE that the JOS in place in 1987 was not working particularly well. During the summer and fall of 1987, Ms. Cooper made attempts to locate another position within the company through this system but was unsuccessful.

#### D. *The First "Excessing" of Plaintiff*

In October of 1987, COBE confirmed in writing that Ms. Cooper's employment with COBE would terminate on December 31, 1987 if she did not secure another position within the company by that date. COBE referred to this method of termination as "excessing." One Dave Cortez, who had been transferred to the plant in Mexico sometime earlier, assumed responsibility for implementing the new materials requirements function for the Mexico plant. Ms. Cooper alleges that this function was basically her job in the PIC Department which the company had purportedly eliminated. COBE contends that Mr. Cortez's job was in fact a combination of several functions with an emphasis on computer planning and programming for raw materials purchase and inventory control. COBE asserts, and the Court finds, that Mr. Cortez was very qualified for these responsibilities. He was also assigned responsibility as a buyer for parts used in the Mexico plant, a job which had previously been assigned to one of Ms. Cooper's co-workers in Denver, Dave Famiano. It is conceded that Ms. Cooper was never a buyer although she performed several of the functions which Cortez later assumed. In addition, Cortez assumed responsibilities of another of Ms. Cooper's co-workers, Sharon Garcia, who had also had her job declared "excessed" in the dissolution of the Denver PIC Department. Ms. Cooper and her co-workers all assisted in the transfer of the functions of their PIC Department to the Mexico plant by providing information and assistance to Mr. Cortez. In fact, Ms. Cooper trained Mr. Cortez to do many of the functions of the job which she had previously performed.

COBE alleges and it appears unrebutted that the decision not to transfer anyone from the PIC Department, including Ms. Cooper, to the Mexico plant was based principally on Mr. Wood's assertion that the performance of that department and of the people employed in that department was unsatisfactory. However, there is no evidence that Ms. Cooper was ever notified in writing of any poor performance in the PIC Department. At the time it became evident to Ms. Cooper that her job functions were being transferred to Mr. Cortez, she confronted Mr. Sam Wood with that fact and asked why she had not been considered for the job. Apparently Mr. Wood advised her that he had made the decision. She alleges that he stated he made the decision "because I had some feed-back on you" and refused to explain the basis of that comment. On several different occasions, she volunteered to be reassigned to Mexico. She assisted in training Mr. Cortez in the functions of his new position, despite her dissatisfaction that his new job had displaced her previous position.

It is also appropriate to note that at no time was the job in Mexico ever posted pursuant to the company's JOS. Mr. Cortez and other transferees to Mexico were pre-selected on a subjective basis. Mr. John Dupont, the manager who purportedly selected Mr. Cortez and others who were later transferred to Mexico, admits that Ms. Cooper was never considered for the position which Cortez filled. He stated that Sam Wood suggested Cortez for the planning job in August of 1987 and that no other persons were ever suggested. He conceded in his testimony that the decisions regarding jobs in Mexico were not based on a purported company policy not to transfer Denver people to Mexico, but rather were based upon the individuals involved and were totally subjective in nature.

During this period, Ms. Cooper coordinated her efforts to obtain new employment with one Barbara Rapp in the company's Human Resources Department. It was later determined that, during this same period, Ms. Rapp was dating Mr. Sam Wood, the plant manager and Ms. Cooper's boss. Ms. Cooper did not know this at the time she was consulting with Ms. Rapp in connection with her efforts to secure other employment within the company. During these early conferences with Ms. Rapp, Ms. Cooper disclosed certain confidences with respect to problems she was having with Mr. Wood and apparently also disclosed personal opinions about Mr. Wood and other matters that were confidential in nature. It is clear to the Court from the evidence that during the time she was consulting with Ms. Rapp, who later became Mrs.

Wood, Ms. Cooper was unaware of Ms. Rapp's relationship with Mr. Wood. It is not clear from the evidence when Ms. Cooper first mentioned Mr. Wood to Ms. Rapp, but it is clear that she had on-going counseling with Ms. Rapp for some time preceding the year 1988. In later testimony Mr. Wood admitted that he had discussions with Ms. Rapp about Ms. Cooper while Ms. Cooper was unaware of their relationship. Mr. Wood and Ms. Rapp had these discussions during the time that Ms. Rapp was working in the company's Human Resources Department and was consulting with Ms. Cooper concerning her "redeployment."

### E. *The EEOC Complaint*

On or about December 19, 1987, Ms. Cooper filed a charge with the Equal Employment Opportunities Commission of the United States complaining of employment discrimination based upon sex. COBE became aware of this charge shortly thereafter, and on December 28, 1987, a few days prior to Ms. Cooper's scheduled termination date of December 31, 1987, Mr. Wood telephoned Ms. Cooper at approximately nine o'clock in the evening at her home. Ms. Cooper testified that Mr. Wood seemed extremely conciliatory and surprised that she was dissatisfied with her termination. He contends that he and the company believed that she was satisfied with the termination and that she did not wish to continue to be employed at COBE Laboratories. She corrected this misimpression and shortly thereafter met with Mr. Wood to discuss extending her employment with COBE to allow her to seek other job opportunities within the company. Mr. Wood offered her a new job assignment which she was purportedly told would eventually become a permanent job unless she was able to obtain another better opportunity. He met with her again in the Arvada plant on or about the 1st of January, 1988, at which time she accepted his proposal. During this meeting, Mr. Wood mentioned the fact that if she elected to take the job, he assumed she would suspend the EEOC proceedings. She agreed that she would do this. She stated that she would drop the EEOC complaint completely, if necessary. At this meeting, Mr. Wood again implied that the job she was taking would be long-term. Although Mr. Wood denies so stating, Ms. Cooper states that he told her that she would no longer be considered "excess", that this job would be permanent. However, the evidence seems to indicate that notwithstanding this misunderstanding, she did continue on "excess" status into 1988 and until she was finally discharged.

### F. *Plaintiff's Reemployment at COBE*

Thereafter, Ms. Cooper was assigned to report solely to Mr. Wood. First, she was assigned duties involving compiling and displaying data. Her job was made extremely difficult by the refusal of some company personnel to provide the necessary data for her to make her reports. Mr. Dupont, the Mexico plant manager, admitted in his testimony that one of the principal reasons Ms. Cooper was criticized for her performance in this job was that she was unable to get the data. The data was not furnished to her because, based "on his priorities," Mr. Dupont chose not to furnish it. Mr. Wood, who was a close professional associate of Mr. Dupont, made no effort to assist Ms. Cooper in obtaining the necessary data.

Ms. Cooper attempted to secure another job while performing the assignment from Mr. Wood, but was unable to do so. Her failure to find another position in the company became the basis for substantial criticism of her during the ensuing months. There is conflicting testimony about the reasons behind her inability to obtain other jobs. However, notwithstanding the statistics submitted by COBE, it appears from the testimony that she made repeated attempts to obtain "redeployment."

During this period, Ms. Cooper was in a "redeployment group" with Ms. Sharon Garcia, Ms. Lori Macklem, Mr. Dave Famiano, and Mr. Bill Pettit. Ms. Garcia indicated that she never saw any indication of Ms. Cooper's bad attitude or of any lack of enthusiasm about continuing to seek work at COBE. Ms. Garcia also indicated that although she herself did not very actively

seek out other jobs while in the "redeployment group", she was never criticized. Mr. Famiano, also a member of the group, testified that everyone in the group participated well and that he, if anyone, had problems. He had only applied for a few jobs during the term of the group and despite this was never criticized by Mr. Wood or others. Mr. Pettit was another member of the "redeployment group" and was one of the "excess" employees from Ms. Cooper's previous department. He bid on several jobs but not on all jobs that were offered. He was never criticized for not bidding on jobs for which he was qualified. He said Ms. Cooper was a hard worker. He was somewhat critical of his co-worker, Mr. Famiano, who had not looked very hard for another job. Mr. Pettit indicated he had no reason to believe that Ms. Cooper was not actively pursuing another job in the company.

During the time that Ms. Cooper was seeking "redeployment", the position in Mexico opened up again. According to Mr. Dupont's testimony, Ms. Cooper was never considered for that position, despite her interest in moving to Mexico. The position was awarded to one Bev Goddard on a purely subjective basis. When Ms. Goddard received the position, Ms. Cooper purportedly attempted to be placed in Ms. Goddard's previous position. This was denied. Ms. Cooper testified that she had been informed by a supervisor that another job she was interested in was vetoed by Mr. Wood because he wished her to continue on the data assignment she was performing for him. Ms. Cooper alleges, and Mr. Wood denies, that he told her the only reason that he vetoed this transfer was that he did not want her taking that position.

During the time that the "redeployment group" was meeting, Mr. Pettit was reassigned. He discussed with Ms. Cooper the possibility of her coming to work with him in his new job. Mr. Pettit assumed the responsibilities for his new job and then obtained a second assignment, thereby acquiring a double workload. Ms. Cooper and Mr. Pettit approached Mr. Wood about the possibility of assigning Ms. Cooper to assist Mr. Pettit and Mr. Wood approved

this assignment on or about May 12, 1988. Mr. Pettit testified that when Ms. Cooper first came to work for him, she was very excited about the job. He indicated that the other workers in the group were also very excited about having her because she had a reputation as a hard worker and a good employee.

Ms. Cooper states that soon thereafter Mr. Wood approached her and advised her that she would not be required to support Mr. Pettit any further and that Mr. Pettit would handle the entire project. Accordingly, she stopped going to the job assignment. Mr. Pettit soon complained to Mr. Wood about Ms. Cooper not helping him. On or about May 23, 1988, Mr. Wood purportedly went to speak to Ms. Cooper about this situation. He alleges that she was not at her desk so he left her a note (Defendant's Exhibit J), stating his concern that she had decided not to support Mr. Pettit's project. The note further indicated that he was disappointed that she had agreed to support the project and was not doing so. According to Mr. Wood, this note was left on the spur of the moment on Ms. Cooper's desk. It is significant that a copy of the note was sent to Mr. Pettit and the note so indicated.

On May 24, 1988, Ms. Cooper addressed a memo to Mr. Wood (Defendant's Exhibit K) alleging that she had attempted on several occasions to contact him and had left messages on his voice mail. He did not return her call despite the apparent urgency of his May 23rd note. She testified that she attempted to contact him for most of that day. Her memo to Mr. Wood made some rather strong accusations, for instance, "you are telling me one thing and writing another." She also indicated her concern about the mixed messages that she was getting from Mr. Wood in being told not to go back to Mr. Pettit's project and then being asked why she had not gone back. Her note concluded "when can we meet?".

Despite this urgent request, Mr. Wood did not meet with Ms. Cooper. Instead, he wrote another note on the 25th, (Defendant's Exhibit L). This note reiterated his

expectations not only for the project that she should have been doing for Mr. Pettit but also for projects she should have been accomplishing for Mr. Wood. Again a copy of this note was sent to Mr. Pettit and again Mr. Wood, despite the apparent urgency of the situation, made no effort to contact Ms. Cooper personally or set up a meeting with her. Mr. Wood testified that he made an effort to meet with her, but the Court questions his testimony.

Finally, COBE offers Defendant's Exhibit M, a letter from Mr. Pettit to Mr. Wood complaining about Ms. Cooper's withdrawal of her support for his program. It states that she had indicated to Mr. Pettit that she had been directed to no longer support the program. It appears from the testimony that this letter was written to Mr. Wood from Mr. Pettit specifically at Mr. Wood's request. Mr. Pettit testified that Mr. Wood had requested the letter before the sequence of notes referred to above.

The matter was again raised by Ms. Cooper when she brought it to the attention of Mr. Burbank. Mr. Burbank addressed Mr. Wood in a letter dated May 31, 1988. That letter (Defendant's Exhibit N) indicates a lack of understanding as to Ms. Cooper's role: "The group was very unclear as to the role that Lynnette should be playing. I was hoping you could join us in one of our ops meetings and explain it to all of us." Again, rather than undertaking any formal explanation, Mr. Wood merely wrote a handwritten note on the letter asserting that her role had not changed.

The Court has considered the circumstances surrounding this exchange of notes and weighed the testimony for credibility. The circumstantial evidence indicates that Mr. Wood made no attempt to clarify any misunderstandings with Ms. Cooper, but merely attempted to document what he perceived to be her insubordination in refusing to accept an assignment he had given her. Based on an analysis of the facts surrounding this exchange of notes, the Court questions Mr. Wood's credibility.

Shortly after this incident, on June 21, 1988, Ms. Cooper filed with the Equal Employment Opportunities Commission a complaint of retaliation for exercise of protected rights. Her job situation following this complaint continued to worsen.

### G. *The Final Performance Evaluation*

On August 26, 1988, Mr. Wood prepared a performance evaluation for Ms. Cooper. That evaluation is contained in Defendant's case as Exhibit S. The evaluation is extremely critical. Mr. Wood criticized Ms. Cooper for everything from telephone answering and supervision of clerks to lack of initiative, poor attitude, and poor behavior. He criticized her for attempting to document reasons why projects could not be completed instead of completing them, for making excuses, for dishonesty, and finally, for "passivity and reticence" on matters of critical importance. He alleged that she had withdrawn from the group process and declined all group members' offers to meet weekly to encourage, counsel and help her. The performance evaluation further alleged that she had made no attempt to secure a job through the JOS and had failed to utilize her time to secure a job despite the company's continued willingness to assist her in securing a regular position. He concluded this appraisal with the threat that if she had not secured a position within six weeks, he intended to meet with her and discuss an actual termination date and severance package. One of the reasons that Mr. Wood gave for the extremely poor appraisal was the incident with Bill Pettit. He stated "Your performance in this area has been totally unacceptable as no substantial support has been provided despite multiple confirmations of the assignment" (Exhibit S). He continued "I have never encountered a professional employee who has refused such a straightforward assignment."

Mr. Wood conceded in his testimony that he made no attempt to contact others, save perhaps Mr. Dupont, to obtain input with regard to Ms. Cooper's performance. It is clear from the evidence that the performance appraisal was totally subjective and was based solely upon Mr. Wood's personal impressions. Based upon the testimony of Ms. Ziegler, Human Resources Manager at COBE, the Court further notes that COBE, during all times relevant to this dispute,

used a totally subjective methodology, both in its assignment and reassignment of personnel. The methods of performance evaluation, and especially those employed by Mr. Wood in appraising Ms. Cooper's performance and handling Ms. Cooper's "redeployment" efforts during the period after the filing of the initial EEOC complaint, were completely subjective. COBE used no testing procedures for transfer, promotion, or appraisal. The JOS was used only when it suited the purposes of supervisors seeking to fill positions. The company knew of this and to its credit attempted to correct this to some extent with its "redeployment" program. Ms. Ziegler admitted that the employees at COBE perceived that the JOS was abused but that the company took no particular action to correct the system. The evidence shows that the company had good intentions along those lines, at least among their top management.

Mr. Wood also admitted that at the time of Ms. Cooper's performance appraisal, he mentioned the EEOC complaints. Ms. Cooper testified that he told her at the performance review that he was upset about "what you are doing outside the company." She alleges that when she asked what he was referring to, he stated "you know, the lawsuit you filed against me for discrimination." Although Mr. Wood denies the specifics of the statement in question, he admits that the EEOC complaint was on his mind. He said that he raised the issue with her because he felt very strongly that he had not been guilty of discrimination or retaliation against her. Mr. Wood also admitted that at the time of the appraisal, he obtained input from the company's attorney. He did not testify as to the privileged communications between him and counsel, but he conceded that he obtained input and that the input changed the appraisal, although not much. He also conceded that prior to this appraisal, he had discussed general "feedback" about Ms. Cooper with his wife, Barbara Wood, previously Barbara Rapp. He conceded that those discussions had been occurring for some time.

Subsequent to Ms. Cooper's performance evaluation from Mr. Wood, she was involuntarily terminated. Although the stated reason for the termination was Ms. Cooper's inability to obtain any other employment in the company following her declaration as an "excessed" employee, Mr. Wood admitted that the inability of Ms. Cooper to do her job was a significant factor in her termination. Mr. Wood testified that had she performed up to his expectations on the jobs that he gave her, she would not have been terminated.

## CONCLUSIONS OF LAW

### A. *Disparate Treatment*

■ The law to be applied in Title VII discriminatory treatment cases is well established. See *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The allocation of the evidentiary burdens is clear. First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of employment discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas v. Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093; *McDonnell Douglas v. Green*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ The establishment of a prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. *McDaniel v. Temple Independent School Dist.*, 770 F.2d 1340, 1345, 1346 (5th Cir.1985). In order to prove a prima facie case of employment discrimination, a plaintiff must show that: (1) she was a member of a protected group; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her

qualifications; and (4) after her rejection, the position remained open to or was awarded to an applicant with plaintiff's qualifications. *McDonnell Douglas v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824.

■ If the plaintiff succeeds in proving a prima facie case, the second evidentiary phase requires the employer to articulate some legitimate nondiscriminatory reason for its adverse employment decision concerning the plaintiff. The employer need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had not been motivated by discriminatory animus. This is the employer's burden of production only, not a burden of persuading the Court that it was actually motivated by the proffered reason. *Texas v. Burdine*, 450 U.S. at 254, 255, 101 S.Ct. at 1094, 1095. If the employer fails to satisfy this burden, the presumption of discrimination remains unrebutted and the plaintiff prevails.

■ However, if the employer satisfies its burden of production, the presumption of discrimination disappears. The case then proceeds to the third evidentiary phase, where the plaintiff is required to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason proffered by the employer was not the true reason for the adverse employment decision. The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989); *Texas v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. The plaintiff's burden may be met either directly by demonstrating that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *McDonnell Douglas v. Green*, 411 U.S. at 804, 805, 93 S.Ct. at 1825, 1826. Types of evidence the plaintiff can use include discriminatory statements or admissions, comparative evidence, and statistics.

■ Plaintiff's Complaint alleges that Dave Cortez, a male with qualifications inferior to Ms. Cooper's, was transferred to the job in Mexico for which Ms. Cooper was better qualified, and that this constituted employment discrimination based upon her sex. However, the evidence supports COBE's contention that the refusal to transfer Ms. Cooper to Mexico was solely a matter of job reevaluation and a re-assignment of functions, not sexual discrimination.

As Mr. Dupont testified, COBE was attempting to combine functions within the company and use the expertise of its personnel in new ways. There was evidence that the new responsibilities for Mr. Cortez included former duties of several people from the Denver PIC Department, Ms. Cooper being only one among them. While some of Ms. Cooper's responsibilities were assumed by Mr. Cortez, there were several people who assumed other parts of her job, as well. There was also evidence that the company was not satisfied with the support that was being provided for the Mexico plant by the PIC Department in Denver.

Mr. Cortez was an engineer with considerable computer expertise. He assumed responsibility for establishing and implementing a computerized materials requirements planning program to be used for planning the purchase of raw materials for the Mexico plant. He also assumed responsibility as a buyer for the parts used by the Mexico plant. Ms. Cooper never officially had the job of buyer. In addition, Mr. Cortez assumed responsibility for master scheduling and later for buying and planning for the Centrysystem 3 disposable product line. Mr. Dupont explained that selecting Mr. Cortez was a different approach, but one with "a lot of potential."

While an employer may not take gender into account in making an employment decision (except in those very narrow circumstances in which gender is a bona fide occupational qualification), it is free to decide against a woman for other reasons. *Price Waterhouse v. Hopkins*, 109 S.Ct. at 1787. COBE has sufficiently set forth legitimate nondiscriminatory reasons for its employment decision with regard to Ms. Cooper's initial involuntary termination and

its selection of Dave Cortez for the job in the Mexico plant. After careful examination of the evidence, the Court must conclude that Ms. Cooper has not met her burden of persuasion that COBE's decisions were motivated by reasons of sex discrimination.

### B. *Disparate or Adverse Impact*

Under the disparate impact theory, a prima facie case is established by showing that a particular job requirement or standard of selection operates to select applicants for hire or promotion in a pattern significantly different from that of the pool of applicants. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Bauer v. Bailar*, 647 F.2d 1037 (10th Cir.1981). Under this theory a prima facie case is established even if the job requirement at issue is facially neutral and even if no showing of intentional discrimination is made. *International Bro. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). After such a prima facie case has been made out the burden shifts to the employer to demonstrate that the job requirement involved has a manifest relationship to the employment in question. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiff then has an opportunity to respond by showing that other methods or standards of selection for hire or promotion would serve the employer's legitimate interests in obtaining qualified employees without resulting in the disproportionate exclusion of a particular group. *Bauer v. Bailar*, 647 F.2d at 1045.

Statistical evidence showing a general pattern of discrimination is relevant to a claim of disparate impact, as is the presence of subjective criteria in the employer's decision-making. *Bauer v. Bailar*, 647 F.2d at 1045. However, disparate impact should be measured against the actual pool of applicants or eligible employees. *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475 (9th Cir.1983). The significance of statistical evidence in any given case depends on all the surrounding facts and circumstances. *Teamsters v. United States*, 431 U.S. at 340, 97 S.Ct. at 1856. In discrimination cases, statistical evidence should be closely related to the issues in the case. *Bauer v. Bailar*, 647 F.2d at 1045; *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir.1975).

Plaintiff's Complaint alleges that COBE discriminated against women at all levels in the company by treating them as inferior to men in wages, benefits, job placement, opportunities for advancement, and conditions of employment. Plaintiff introduced some statistical evidence as to the number of females in supervisory and managerial ranks at COBE. However, Plaintiff's statistics do not reflect the number of *qualified* females competing for those supervisory and managerial positions, or even how many females applied for such positions. An employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. *Texas v. Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096. There was no evidence concerning wages or benefits of females as compared to males at COBE. There was very little evidence concerning how women other than Ms. Cooper were treated at COBE. The evidence in the record is insufficient to show that females at COBE were discriminated against in employment practices. There is no showing of disparate impact.

### C. *Retaliation*

The employment discrimination analysis set forth in *McDonnell Douglas* applies both to the charge of discrimination and to the charge of retaliation. *Romero v. Union Pac. RR.*, 615 F.2d 1303 (10th Cir.1980). A plaintiff need not be successful on an original charge of discrimination in order to have a valid claim of retaliation. *Id.; Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir.1977).

To prove a claim for retaliation under § 704(a), the plaintiff must first establish a prima facie case. The burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the alleged acts of reprisal. Lastly, the burden returns to the plaintiff, who is given an opportunity to demonstrate that the em-

ployer's reasons are a mere pretext for discrimination taken in retaliation for participation in protected activities. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir.1980).

 In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) she was disadvantaged by an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action taken by the employer. *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339 (10th Cir.1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). The causal connection can be demonstrated by direct or circumstantial evidence that creates an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Examples of retaliatory treatment include disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of a probationary period.

 The presence of subjective decision-making can also create a strong inference of discrimination. *Bauer v. Bailar*, 647 F.2d at 1045. The appropriate inference to be drawn from the presence of subjective criteria varies with the facts of the case. Subjective considerations are not unlawful *per se.*

 It is clear to the Court that, at all times pertinent to this case, COBE employed a subjective system for transferring, placing, promoting, and evaluating its employees. Even where allegations of discrimination were involved, the company addressed the problems in a subjective manner. Ms. Ziegler testified that discussions with regard to EEOC complaints and other personnel matters were oral and undocumented. When investigating retaliation claims, the company generated documents for the EEOC, but no documents were kept internally. Ms. Ziegler testified that a failure to follow a company policy in the termination process would be totally inappropriate. Yet, in the case of Ms. Cooper, while Mr. Wood admitted that the inability of Ms. Cooper to do her job was a significant factor in her termination, no one made any attempt to follow the stated personnel policies of the company involving termination based on discipline, alleging simply that discipline was not involved in this termination. COBE alleges Ms. Cooper was terminated solely because she was "excess," not because of performance problems, notwithstanding Mr. Wood's admission to the contrary. COBE alleges that it was surprised that Ms. Cooper wanted to stay at COBE in December of 1987, that it created a job solely to bring her back and give her that opportunity, and that none of this had any relation to her EEOC complaint. This explanation is inconsistent with the evidence that, at the time that Ms. Cooper was brought back in January of 1988, Mr. Wood inquired about her EEOC complaint. COBE alleges the sole basis for her termination was her apparent lack of interest in staying with COBE, as indicated by her failure to apply for or obtain another position in the company. But COBE's assertions are contrary to the evidence.

Ms. Cooper exercised her rights in filing a complaint with the EEOC. Her complaint was based on her reasonable perception that she had an actionable claim for discrimination. COBE had knowledge of her EEOC complaint when it hired her back and put her under Mr. Wood's supervision. Mr. Wood specifically talked to her about dropping her EEOC complaint when the two of them met in early January, 1988. Mr. Wood then undertook what appears from the evidence to have been a calculated and purposeful campaign of harassment. He gave her assignments that she could not complete and then criticized her for not completing them. He gave her confusing and conflicting instructions for her job assignments. He failed to assist her in obtaining employment and actually sabotaged some of her attempts to obtain employment, yet he accused her of not trying to find a job. Mr. Wood used the incident where Ms. Cooper stopped supporting Mr. Pettit as a way to document an incident that he would later use to adversely affect her performance evaluation. That performance evaluation was then used as a significant factor in her termination. Mr.

Wood brought up the EEOC complaint again when he met with Ms. Cooper for her performance appraisal.

The entire treatment of Ms. Cooper from the time she was put back on the payroll in January of 1988 until she was ultimately terminated in November of 1988 was subjective and retaliatory. The entire appraisal process was subjective and under Mr. Wood's control. The evidence indicates that his actions were retaliatory in response to her filing of the EEOC complaints in exercise of a protected right.

The company was aware of her problems with Mr. Wood, yet it did not investigate thoroughly his attempts to assist her "redeployment" and the allegations that he had vetoed her job applications. The Human Resources Department knew that Ms. Cooper was alleging that Mr. Wood was trying to sabotage her effort to find another position, but it made no effort to investigate the credibility of that concern. COBE alleges that the original transfer of Ms. Cooper's department to Mexico was based on that department's poor performance and yet concedes that there was no written documentation of any lack of performance by Ms. Cooper or by her department. COBE concedes that Mr. Wood had substantial input in Ms. Cooper's termination and that the company was aware of the poor performance evaluation she received from him. COBE was aware that Ms. Cooper had fifteen years of very good to outstanding performance, but made absolutely no effort to investigate the situation or Mr. Wood's motivations.

The evidence is clear that the alleged "legitimate" reasons for Ms. Cooper's termination were merely rationalizations and not truly legitimate reasons. It is clear from the evidence that Ms. Cooper was terminated in retaliation for her exercise of her legal rights, specifically, by filing with the United States Equal Employment Opportunity Commission her original complaint in December of 1987, and her second complaint in June of 1988.

**D.** *Relief*

42 U.S.C. § 2000e–5(g) provides:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable....

▬▬ Reinstatement is clearly available under Title VII and should be awarded if discrimination is established. In her testimony, Ms. Cooper indicated that she wants her job back. The evidence indicates that Ms. Cooper was a cooperative employee, even during the difficulties with her employer. Reference was made during the course of the trial to the fact that COBE has been sold to another company and may undergo some changes. In light of all the evidence presented, the Court finds reinstatement to be an appropriate remedy.

District courts have broad discretion in fashioning equitable relief to make victims of discrimination whole. *United States v. Lee Way Motor Freight*, 625 F.2d 918 (10th Cir.1979). Back pay is not an automatic or mandatory remedy; it is left within the Court's discretion. *Albemarle v. Moody*, 422 U.S. at 415, 416, 95 S.Ct. at 2370, 2371. Such discretionary choices are to be guided by sound legal principles. The decision must therefore be measured against the purposes and objectives of Title VII. One of the purposes of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination. *Id.* at 417, 418, 95 S.Ct. at 2371, 2372. Given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for

injuries suffered through past discrimination. *Id.* at 421, 95 S.Ct. at 2373.

The evidence in this case shows that at the time she was ultimately terminated on November 4, 1988, Ms. Cooper was at a salary level of $2,687.00 per month plus vacation leave, sick leave, health insurance benefits, a stock purchase plan and retirement benefits.

### 1. Additional Elements of Back Pay

Whether unemployment benefits should be offset against amounts received as back pay is a question that has not been resolved uniformly by the courts. Ms. Cooper here testified that she received approximately seven weeks of unemployment benefits for a total of approximately $1,200.00. This Court follows the rule that Ms. Cooper's unemployment benefits should not be deducted from any back pay award. *International Association of Machinists and Aerospace Workers v. Champion Carriers, Inc.,* 470 F.2d 744, 745 (10th Cir.1972); *Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 627 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *Kauffman v. Sidereal Corp.,* 695 F.2d 343 (9th Cir.1982); *Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549 (11th Cir.1983); *E.E.O.C. v. Ford Motor Co.,* 645 F.2d 183 (4th Cir.1981), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Pedreyra v. Cornell Prescription Pharmacies,* 465 F.Supp. 936 (D.Colo.1979).

Next is the question of any additional damages for lost benefits in the form of health insurance, vacation leave, sick leave, and pension plan benefits. The testimony showed that Ms. Cooper's health insurance through COBE cost her approximately $60.00 per month. After her termination, she was forced to seek substitute insurance at a cost of $385.00 per month. After her employment with Wal–Mart, her health insurance cost her $72.00 per month. Ms. Cooper is entitled to recover for the loss of her medical insurance benefits, with the measure of that loss based on the out-of-pocket expense to Ms. Cooper for the continuing payment of premiums. *Fariss v. Lynchburg Foundry,* 769 F.2d 958 (4th Cir.1985); *Pedreyra v. Cornell,* 465 F.Supp. at 951.

Because back pay awards in Title VII cases should completely redress the economic injury the claimant has suffered as a result of discrimination, Ms. Cooper is also entitled to credit for the sick leave and vacation leave that she would have accumulated between November 4, 1988 and August 6, 1990. *Rasimas v. Michigan,* 714 F.2d at 626; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir. 1974); *Bowe v. Colgate–Palmolive Co.,* 489 F.2d 896, 902 (7th Cir.1973); *Catlett v. Missouri State Highway Com'n.,* 627 F.Supp. 1015 (W.D.Mo.1985).

Pension benefits have also been included as a normal part of a back pay award. *U.S. v. Lee Way,* 625 F.2d at 945. Because Ms. Cooper was forced to withdraw her pension contributions at the time of her termination, she should be made whole as to her pension benefits. Ms. Cooper is entitled to have her entire pension reinstated. In other words, the company should reimburse her for any and all contributions that would have been made to her pension fund between her termination date and the date of this order. Since she was paid at termination for her contribution, it should be her responsibility to repay the amount necessary to reinstate the employee portion of the pension for the period up to her November 4, 1988 termination date. COBE should not, however, be held liable for the $1,500.00 penalty Ms. Cooper incurred in choosing not to roll her entire pension over into an I.R.A. account.

There was evidence introduced at trial concerning Ms. Cooper's stock purchase plan, however, damages were not sufficiently shown and are too speculative to warrant any award.

Although Title VII does not specifically provide for interest on a back pay award, prejudgment interest is an allowable part of a back pay award that is within the discretion of the Court. *U.S. v. Lee Way,* 625 F.2d at 940; *Whatley v. Skaggs Companies, Inc.,* 707 F.2d 1129 (10th Cir.1983) *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983). In this case, the Court

declines to award prejudgment interest because this is not a case where the back pay award has been delayed for a long period of time that would make an award of interest compelling.

### 2. Deductions and Offsets

The period of back pay entitlement continues to run during the employment at a lower paying job, with any earnings acquired during the interim period deducted from a subsequent back pay award. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir.1985); *E.E.O.C. v. Monarch Mach. Tool Co.*, 737 F.2d 1444 (6th Cir. 1980). The evidence in this case indicated that Ms. Cooper has been employed in retail sales at Wal–Mart from sometime in late 1988 or early 1989 until the present, at a wage of $5.00 per hour for 32 hours per week.

### 3. Attorney's Fees

■ 42 U.S.C. § 2000e–5(k) provides:
In any action or proceeding under this title [42 U.S.C. §§ 2000e et seq.] the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs.

Under the Civil Rights Act, attorney's fees should be awarded to the prevailing plaintiff absent special circumstances that would render an award unjust. *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Such fees are within the sound discretion of the trial court. *Comacho v. Colorado Electronic Technical College, Inc.*, 590 F.2d 887 (10th Cir.1979). A fee should be set at an amount sufficient to encourage individuals injured by discrimination to seek judicial relief. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (en banc). Even where the plaintiff does not prevail on all the original claims, if she prevails on any significant issue she is the "prevailing party" and attorney's fees may be awarded. *E.E.O.C. v. Murphy Motor Freight*, 488 F.Supp. 381 (D.Minn.1980).

Whether or not costs, as distinct from attorney's fees, shall be awarded is a matter of judicial discretion. *See* Federal Rules of Civil Procedure, Rule 54(d); *Reynolds v. Coomey*, 567 F.2d 1166 (1st Cir. 1978). Prevailing plaintiffs may be entitled to those costs incurred in litigation that are usually passed on to a client. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir.1984).

### ORDER

IT IS THEREFORE ORDERED that Lynnette Cooper be reinstated at COBE in a position comparable to that which she had on November 4, 1988. Her salary shall be the same as it was on November 4, 1988. Her reinstatement shall be effective as of August 6, 1990.

IT IS FURTHER ORDERED that Lynnette Cooper is awarded $44,145.00 in back pay, including damages for lost insurance benefits and a deduction for interim earnings.

IT IS FURTHER ORDERED that Lynnette Cooper be given credit for all sick and vacation leave that she would have accumulated between November 4, 1988 and August 6, 1990. Credit for her sick and vacation leave may be given to Ms. Cooper in the form of a cash payment or by reinstating her accumulated leave.

IT IS FURTHER ORDERED that Lynnette Cooper be reimbursed for any and all contributions that would have been made by the company to her pension fund between November 4, 1988 and August 6, 1990. Ms. Cooper shall be responsible for reinstating her employee portion of the pension fund for the period before November 4, 1988.

IT IS FURTHER ORDERED that Lynnette Cooper is awarded costs and reasonable attorney's fees. Counsel for Ms. Cooper shall submit an affidavit of attorney's fees which will be acted upon by the Court by separate order.

Pursuant to Rules 52(a) and 58 of the Federal Rules of Civil Procedure, judgment is entered according to this Order.