**Clinton HYSTEN, Plaintiff,**

**v.**

**JEFFERSON COUNTY BOARD OF COUNTY COMMISSIONERS, Defendant.**

**Civil Action No. 97–2100–KHV.**

United States District Court, D. Kansas.

Feb. 2, 1998.

Pantaleon Florez, Jr., Florez & Frost, P.A., Topeka, KS, for Plaintiff.

Michael T. Jilka, Wendell F. Cowan, Jr., Celia K. Garrett, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Defendant.

## *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Plaintiff Clinton Hysten, a former employee of the highway department of Jefferson County, Kansas, seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Kansas Act Against Discrimination, K.S.A. § 44–1001 *et seq.* Specifically, he claims that defendant discriminated against him on the basis of race and retaliated against him for filing a charge of discrimination in March of 1994. Defendant seeks summary judgment on all claims.

*See Motion For Summary Judgment* (Doc. # 29) filed November 25, 1997.

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Applying this standard, for reasons discussed more fully below, the Court finds that defendant's motion should be and sustained in part and denied in part.

***Factual Background***

The following facts are undisputed or, where disputed, construed in the light most favorable to plaintiff.[1]

On May 8, 1992, Clinton Hysten applied for a position as a highway maintenance employee with the Jefferson County Highway Department [the County]. Plaintiff applied for full-time employment but the County hired him as a temporary summer employee beginning that month. In 1993, the County offered plaintiff a full-time position as a "tire man." Plaintiff declined the job because he did not want it. At some point, plaintiff talked to Richard Teaford, Jefferson County Engineer, about full-time employment. Plaintiff was told that he would need a commercial driver's license, which he did not have.

Although the County originally hired plaintiff as a temporary summer employee, he apparently continued to work on a more or less regular basis from May, 1992 through December, 1994. He reported for work every day at 8:00 or 9:00 a.m., and worked "when there was work to be done." Sometimes the man in charge would send plaintiff home because there was nothing to do, but similarly situated white employees were allowed to work. Plaintiff was sent home more frequently after George Pentlin became his supervisor. At some point plaintiff complained to Teaford that he was being sent home when white employees were being allowed to work. Within a reasonable time after plaintiff complained, the County remedied this situation.

The County Highway Department workplace was racially charged, it was common for permanent full-time white employees to use the term "nigger" and tell off color jokes. This activity generally occurred behind plaintiff's back but it was a frequent occurrence and was "commonly known to occur." Notwithstanding this situation, plaintiff received regular salary increases during his tenure with the County and, because he liked the work, he considered his job with the County the best job he ever had. Eric Eck, a similarly situated white employee who worked for the County during part of plaintiff's tenure, observed that the County had no highway department employee who completed and performed job tasks better than plaintiff.

On December 29, 1992, the County reprimanded plaintiff for carelessness, *i.e.,* losing a chain saw which had been improperly secured on the back of a county truck. That same day, plaintiff signed a statement which concurred with the County's accusation that he "in company with Carl Walker, on an unauthorized trip from Rock Creek Area to the Meriden Area, did lose a brand new Model 028 Stihl chainsaw which was improperly secured on the back of the County Truck." As a result of that warning, both plaintiff and Walker (a white permanent employee) received one-week suspensions without pay.

On December 31, 1993, plaintiff received a written warning for failing to notify the office that he was not coming to work, as required by Department Policy. Plaintiff signed the written warning and indicated his concurrence with the County's statement of the violation.

At some point, plaintiff filed a charge of discrimination against the County. On March 14, 1994, the County received notice

1. The Court ignores all statements of fact which are not properly set forth in compliance with D.Kan. Rule 56.1 and the *Scheduling Order* (Doc. # 13) filed August 27, 1997. Accordingly, the Court does not consider defendant's "evidence" regarding pay raises for plaintiff relative to white employees, the fact that defendant was forced to reduce plaintiff's paycheck due to a child support order, the fact that plaintiff lost 1% of a possible 4% pay increase because he had acknowledged a violation of department policy in 1992, or evidence that two white employees lost portions of their pay increases due to departmental violations.

of the charge from the Kansas Human Rights Commission. No one talked to plaintiff about the charge and to his knowledge, no one "punished" him for filing it.

All County employees were in radio contact with the main Department office. From time to time Debra Miller, the office manager who handled time sheets and work documentation, called over the radio and corrected time card mistakes made by white employees. From time to time, Eck made mistakes on his time card and Miller corrected them. Defendant never accused Eck of falsifying time cards or disciplined him because of the time card issue. The record contains conflicting evidence whether defendant treated black and white employees the same, in their dealings with time cards. Eck claims that plaintiff was not treated the same as white employees but Miller claims that he was. Eck states that to his knowledge the County has never disciplined a white employee for turning in a time card that was wrong. This statement stands unrefuted, although Miller claims that plaintiff's mistakes were more frequent and more serious than the mistakes of white employees.

On April 18, 1994, one month after the County received notice of plaintiff's charge of discrimination, plaintiff received a written warning for consistently turning in falsified time sheets which claimed time that he had not worked and, specifically, for making six false claims (40.5 hours) in the preceding two-week period. When the County confronted him about the matter, plaintiff signed the warning and indicated his concurrence with the County's statement of the violation. The warning advised plaintiff that "[f]alsifying time sheets cannot be condoned, and if it doesn't stop, your employment may be terminated."

Less than two weeks later, on May 2, 1994, plaintiff received another written warning for falsifying time sheets. The time card in question looked like every other time card plaintiff had turned in but when confronted, plaintiff signed the warning and indicated his concurrence with the County's statement that he had "again turned in a falsified time sheet." The warning admonished plaintiff that because this was his third violation in less than seven months, his part-time employment would be terminated if he had another violation on or before December 20, 1994. Plaintiff signed the warning, acknowledging that he had read the warning decision and that he understood it.

Miller had called plaintiff and tried to teach him how to fill out his time sheets, and as far back as January of 1993, she had amended plaintiff's time sheets or assisted him in doing so. Miller believed that plaintiff had limited ability to read. Consistent with her belief, plaintiff claims that although he signed the written warnings which indicated that he concurred with the County's statements of the violations, he does not know the meaning of the word "concur." The County used written warning forms (entitled "Employee Warning Report") to document employee discipline. Each form had two boxes where the employee could respond to the "Company Statement" of the alleged infraction. For each warning, plaintiff checked the first box, which stated "I concur with the Company's statement." The other box stated "I disagree with the Company's statement" and left space the employee to state reasons for disagreement. Plaintiff also signed separate statements which indicated that he had read the warnings and understood them.

On December 27, 1994, Teaford advised all part-time employees in the Road Department that part-time employment for 1994 would end, effective December 31, 1994, but that "anyone interested" was invited to reapply when the County advertised for part-time help in 1995. Consistent with this announcement, the County terminated plaintiff's employment and that of three white temporary employees (Eric Eck, Matt Roberts and Zack Brown) effective December 31, 1994. According to Teaford, the decision was made because there was not enough work and the County could not financially justify keeping temporary workers on the payroll when permanent workers were idle. Plaintiff claims that this explanation is a pretext for discrimination, citing evidence that the County's total budget allocation for the road, bridge and highway departments increased "about $500,000" (from $1,642,650.00 to $2,149,734.00) between 1994 and 1995. Also, the County sometimes moved plaintiff and its other employees between payroll funds to pay wages.

Plaintiff argues that the County laid off the three white workers so that it could terminate his employment on account of his race.[2] In support of this allegation, plaintiff cites testimony by Eck (one of the white employees whose employment was terminated along with that of plaintiff), to the effect that "[a]fter Mr. Hystens [sic] separation I learned that the County did in fact layoff the other temporary part-time white employees so that they could get rid of Mr. Hysten." *Affidavit of Eric Eck,* Exhibit 3 to *Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 36) filed January 7, 1998 [*Eck Affidavit* ]. Plaintiff also cites the affidavit of Mary Oliver, a private investigator plaintiff hired to investigate his claim of discrimination. Oliver avers that she interviewed past and current employees and residents of Jefferson County, and that her investigation revealed that "county officials had acknowledged that the December of 1994 layoff of white employees was accomplished so that Pentlin could eliminate Mr. Hysten from county employment because of his race." Oliver adds that she has participated in "numerous investigations in the State of Kansas" and that "[r]ace discrimination was commonly known to have been practiced within Jefferson County's Road Department during Mr. Hysten's employment." *Affidavit of Mary P. Oliver,* Exhibit 4 to *Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 36) filed January 7, 1998 [*Oliver Affidavit* ].

No supervisor ever made a racial slur directly to plaintiff. Pentlin does not recall ever stating, in reference to plaintiff, that he intended to "fire that nigger." Pentlin did so, however, in front of numerous County employees, including Walker and Eck, Plaintiff learned about this statement from Eck, in the summer of 1992 (his first summer on the job). Pentlin denies that he bears "ill will toward black people," but according to plaintiff, "in communication with George ... George don't like black people."

The record reveals no evidence that as of December 31, 1994, Teaford knew of any racial slur by Pentlin.[3] At some point, Pat Sieve, a white employee, had tried to put plaintiff in a water tank. Plaintiff stopped him, and Teaford had no knowledge of any pranks or horseplay directed at plaintiff. Plaintiff never complained to Teaford about race discrimination in the workplace.

Plaintiff has no evidence that anyone other than Teaford had anything to do with his termination.[4] Pentlin was in charge of day-

2. The matter is not properly established in the record, but the Court infers that plaintiff is black.

3. Plaintiff argues otherwise, again citing the affidavits of Walker, Eck and Oliver. According to Walker and Eck, the County Highway Department workplace was racially charged; it was common for the permanent full time white employees to use the term "nigger" and tell off color jokes; and while such activity generally occurred behind plaintiff's back, it was a "frequent occurrence" and was "commonly known to occur." Oliver makes a similar point, stating that "[r]ace discrimination was commonly known to have been practiced within Jefferson County's Road Department during Mr. Hysten's employment." *Oliver Affidavit,* ¶ 9.

Plaintiff has established through these affidavits that the atmosphere in the County road department was racially charged. Unfortunately, however, he has not placed Teaford—the County Engineer—in that work environment. Therefore the record yields no reasonable inference that Teaford knew or had reason to know that white employees commonly used the term "nigger" and told off color jokes. Much less does the record support a reasonable inference that Teaford had particular knowledge that Pentlin had expressed an intent to "fire that nigger."

4. Plaintiff disagrees with this statement, citing the affidavits of Walker, Eck and Oliver. Even giving plaintiff the benefit of all favorable inferences, however, the cited testimony does not support plaintiff's position that persons other than Teaford participated in the decision to terminate his employment.

Walker's affidavit states merely that at some undefined point in time, Pentlin (in the presence of numerous county employees) said in reference to plaintiff that he intended to "fire that nigger." *Affidavit of Carl Walker,* Exhibit 5 to *Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 36) filed January 7, 1998 [*Walker Affidavit* ], ¶ 5. It does not suggest that Pentlin participated in the decision to terminate plaintiff's employment.

Eck states that he heard the same remark by Pentlin and that after December 31, 1994 (when both he and plaintiff lost their jobs), he "learned that the County did in fact layoff the ... temporary part-time white employees so that they could get rid of Mr. Hysten." *Eck Affidavit,* ¶¶ 10 and 11. Eck's affidavit does not inform us who made the decision to terminate plaintiff's employment.

Oliver swears that she has participated in "numerous investigations in the State of Kansas"

to-day functions of the Highway Department; he could not hire and fire, but he instructed employees where to work and what to do. He could initiate employee discipline and when he did so, he would be involved in the disciplinary process.[5] Pentlin was not authorized to terminate the employment of any county employee. Plaintiff admits that Pentlin could not terminate his employment without first going to Teaford.

Although Teaford had announced on December 27, 1994, that "anyone interested" was invited to reapply when the County advertised for part-time help in 1995, plaintiff did not do so.

### *Analysis*

Plaintiff claims that defendant discriminated against him in (1) refusing to consider him for part-time or full-time positions and filling them with equally or less qualified white employees; (2) subjecting him to disparate terms and conditions of employment; (3) allowing co-workers to make disparaging or derogatory race-based comments; and (4) terminating his employment effective December 31, 1994. *Pretrial Order* (Doc. # 28) filed November 20, 1997, at 3–4. Plaintiff also claims that on March 10, 1994, he filed a charge of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission, and that shortly after defendant received notice of the charge, it retaliated against him by initiating disciplinary action for falsifying time sheets. *Pretrial Order* (Doc. # 28) at 3.

### A. Disparate treatment claims

Defendant argues that it is entitled to judgment as a matter of law because it treated plaintiff the same way as it treated similarly situated white employees and plaintiff therefore cannot establish a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff disagrees, citing direct evidence of discrimination which in his view "overrides" *McDonnell Douglas.* The Court addresses each argument in turn. Preliminarily, however, it notes that a discrimination plaintiff may prove his case in two ways: by direct evidence or circumstantial evidence. *MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1441 (10th Cir. 1996). Direct evidence, though rare, consists of "proof of an existing policy which itself constitutes discrimination." *Mosley v. Pena,* 100 F.3d 1515, 1519 (10th Cir.1996).

When a discrimination plaintiff relies on circumstantial rather than direct evidence, courts apply the three-part analysis adopted in *McDonnell Douglas, supra.* Under this approach, plaintiff must first establish a prima facie case. If that occurs, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its action. If defendant identifies such a reason, plaintiff must prove that defendant's stated reason is actually a pretext concocted to conceal an illegal discriminatory motive. *Trujillo v. Grand Junction Regional Ctr.,* 928 F.2d 973, 977 (10th Cir.1991).

To demonstrate pretext sufficient to require a trial, plaintiff must produce specific

and that her "investigation revealed that county officials had acknowledged that the December of 1994 layoff of white employees was accomplished so that Pentlin could eliminate Mr. Hysten from county employment because of his race." *Oliver Affidavit,* ¶¶'s 6 and 7. Such testimony does not tend to establish that Pentlin participated in the decision to terminate plaintiff's employment as of December 31, 1994.

Asked whether he had evidence that anyone other than Teaford had anything to do with his payoff, plaintiff stated at his deposition, "I don't, I don't, I don't, I don't know. Could be." *Deposition of Clinton Hysten* at 108.

5. As evidence for his claim that Pentlin "had influence in the decision to fire employees," plaintiff cites the affidavits of Eck and Walker, Exhibits 3 and 5 to *Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 36) filed January 7, 1998. Eck and Walker worked with plaintiff and swear that as a result, they "became aware of County personnel practices and their application to Mr. Hysten." The Court accepts these statements, though their meaning is not clear.

Walker also swears that Pentlin could "cause" employees to be fired if they did not do their jobs. This testimony is not relevant to the issue before us. Even if Pentlin had authority to discipline employees for not doing their jobs and could "cause" them to be fired on that ground, the record contains no evidence that Pentlin accused plaintiff of not doing his job or caused him to be fired on the pretextual ground that plaintiff was not doing his job.

facts showing that defendant's explanation is "unworthy of credence" or demonstrate directly that a discriminatory reason more likely motivated defendant's action. *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994). Where plaintiff fails to come forward with facts meeting one of these two alternatives, defendant is entitled to summary judgment. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 529 (10th Cir.1994).

**1. Refusal to consider plaintiff for part-time or full-time positions**

As noted above, plaintiff claims that defendant refused to consider him for part-time or full-time work, filling such positions with equally or less qualified white employees on account of his race. The record on this issue reveals that in 1993, the County offered plaintiff a full-time position as a "tire man" but plaintiff declined because he did not want the job. At some point, plaintiff talked to Teaford about full-time employment, but was told that he would need a commercial driver's license—which he did not have.

To prevail on his claim, plaintiff must establish a prima facie case of discrimination under *McDonnell Douglas.* Under that standard, plaintiff must show each of the following elements: (1) that he is a member of a class protected by Title VII; (2) that he was qualified for the position sought; (3) that defendant denied him the position; and (4) that defendant selected others with similar qualifications for the position. *See e.g., Carlile v. South Routt School Dist. RE-3J,* 739 F.2d 1496, 1500 (10th Cir.1984).

Plaintiff maintains that he was qualified for a full time position but he has failed to produce evidence regarding what full time positions were available, what the requirements for the positions were, or that he met those requirements. In short, plaintiff has failed to provide any evidence that defendant had an available position for which he was qualified. As a result, the Court need not consider whether defendant's alleged refusal to consider plaintiff for another position raises an inference of intentional discrimination. Plaintiff's claim is merely an unsupported allegation that unidentified white employees received favorable treatment, and it must therefore fail. *See Branson v. Price River Coal Co.,* 853 F.2d 768, 771–72 (10th Cir. 1988) (citing *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 (9th Cir.1983))(to avoid summary judgment, party must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any material fact claimed to be disputed); *Redmond v. Day & Zimmerman, Inc.,* 897 F.Supp. 1380, 1384 (D.Kan.1995), *aff'd* 85 F.3d 641 (10th Cir.1996). Plaintiff has not established a triable issue regarding a prima facie case of discrimination under *McDonnell Douglas.*

The Court accepts plaintiff's legal premise that direct evidence of discrimination makes the *McDonnell Douglas* approach unnecessary. *See e.g., Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1549 (10th Cir. 1987). The Court does not agree, however, that plaintiff has direct evidence of discrimination on this issue. A plaintiff in an employment discrimination case proves discrimination by direct evidence when he presents proof of "an existing policy which itself constitutes discrimination." *Mosley v. Pena,* 100 F.3d at 1519; *see also Ramsey v. City and County of Denver,* 907 F.2d 1004, 1008 (10th Cir.1990). Plaintiff claims that direct evidence of discrimination is "abundant," but the record refutes his contention. Most of plaintiff's evidence begs the point, either because it is the subject of this very motion [6] or because it is apparently unrelated to the issue at hand.[7]

Evidence that Pentlin referred to plaintiff as a "nigger" is not direct evidence of discrimination on this issue because plaintiff has not established that Pentlin had anything to do with defendant's failure to offer him another position. The Court would condemn Pentlin's comment if he made it—and for purposes of this motion we assume that

6. To-wit: the claims that defendant sent plaintiff's home but allowed white employees to work, singled out plaintiff for discipline regarding time sheets, subjected plaintiff to disparate treatment, and fired plaintiff on account of his race.

7. To-wit: the claim that fellow employees commonly invoked racial epithets and on occasion engaged in horseplay at plaintiff's expense.

he did. On this record, however, no reasonable jury would find that Pentlin's isolated comment gives rise to an inference that defendant denied plaintiff another position on account of his race. In order for remarks to be sufficiently probative of discriminatory intent, plaintiff must demonstrate a nexus between the alleged discriminatory statements and defendant's adverse decision. *Rea v. Martin Marietta Corp.*, 29 F.3d at 1457; *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d at 531; *Heim v. Utah*, 8 F.3d 1541, 1547 (10th Cir.1993) (stray remarks in workplace cannot justify requiring employer to prove that its decisions were based on legitimate criteria); *Eslinger v. U.S. Central Credit Union*, 866 F.Supp. 491, 498 (D.Kan.1994).

The record does not disclose any particular positions which were available or identify any decision-maker who filled with positions with less qualified white employees. In such circumstances, plaintiff has not demonstrated a sufficiently close connection between Pentlin's comment and defendant's decision not to offer plaintiff another position. As a result, Pentlin's comment does not constitute direct evidence of discrimination which creates a genuine issue of fact for trial by "overriding" the *McDonnell Douglas* analysis.

As further direct evidence of discrimination, plaintiff claims that "[w]hite employees 'laid off'/terminated in December 1994 upon inquiry ... were told the County had to lay them off to get rid of Plaintiff." One of these white employees—Eck—has filed an affidavit which conspicuously omits any such evidence. Indeed, plaintiff's evidence on this point comes not from any white employee who was told that "the County had to lay them off to get rid of plaintiff," but from plaintiff's private investigator. Oliver's affidavit reports that her investigation "revealed that county officials had acknowledged that the ... layoff of white employees was accomplished so that Pentlin could eliminate Mr. Hysten from county employment because of his race." Oliver does not identify which county officials made the alleged admissions, nor does she identify the persons to whom county officials made the purported admissions.

At the summary judgment stage, affidavits must "set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir.1992) (in opposing summary judgment, nonmovant must make showing that if reduced to admissible evidence would be sufficient to carry nonmovant's burden of proof at trial).

To be sure, the nonmoving party need not produce evidence in a *form* that would be admissible at trial, but the content or substance of the evidence must be admissible. *Celotex Corp.*, 477 U.S. at 324; *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994). For example, hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Furthermore, "generalized, conclusionary, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment." *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir.1975); *see also Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir.1990).

Oliver's affidavit is not competent direct evidence of discrimination which is sufficient to defeat defendant's motion for summary judgment under these standards. Oliver does not purport to have personal knowledge why defendant laid off any of the four employees effective December 31, 1994. Her affidavit is based solely on hearsay—perhaps double or triple hearsay, at that—concerning statements by unidentified county officials. She does not claim that the unidentified officials made the statements to her. As a result, her affidavit does not meet Rule 56(e) standards. It does not affirmatively show that Oliver is competent to testify to many of the matters stated therein. *See Malek v. Martin Marietta Corp.*, 859 F.Supp. 458, 460–61 (D.Kan.1994).

In summary, the Court concludes that plaintiff has not established through direct or circumstantial evidence an actionable claim that defendant discriminated against him on

the basis of race when it refused to offer him another position.

### 2. Disparate terms and conditions of employment

The pretrial order contains a non-specific allegation that defendant subjected plaintiff to disparate terms and conditions of employment.[8] Aside from allegations addressed elsewhere in this order, the record reveals little evidence regarding this claim. From plaintiff's brief in opposition to defendant's motion for summary judgment, the Court infers that plaintiff complains about (1) the fact that defendant allowed white employees to work but sent him home on short work days; (2) the fact that a fellow employee tried to dunk him in a water tank; and (3) the fact that defendant disciplined him for time sheet infractions while it did not discipline white employees. *See Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 36) filed January 7, 1998.

As to the allegation that defendant allowed white employees to work but sent plaintiff home on short work days, defendant has not identified any respect in which plaintiff may be unable to establish a prima facie case of discrimination. If anything, defendant concedes the point by failing to address it except to say that its actions "reflect a willingness to listen to plaintiff's concerns and take action to remedy any unfairness perceived by the plaintiff." On a summary judgment motion, the moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Defendant has not met its burden with respect to this issue and its motion on this claim is therefore overruled.

By his reference to horseplay by fellow employees, the Court infers that plaintiff attempts to assert a hostile environment claim. Although hostile work environment is not explicitly mentioned in Title VII, it is well established that a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e–2(a)(1). *See e.g., Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir.1994), *cert. denied* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); *Aramburu v. Boeing Co.*, 911 F.Supp. 1377, 1392 (D.Kan.1995). To constitute actionable harassment, the conduct must be "sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

For plaintiff's harassment claim to survive summary judgment, however, his facts must support the inference of a racially hostile environment, *see id.*, and support a basis for liability, *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987). Specifically, plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, *Meritor*, 477 U.S. at 67, and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show " 'more than a few isolated incidents of racial enmity.' " *Hicks*, 833 F.2d at 1412 (quoting *Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir.1986)).

The evidence in this case falls far short of meeting plaintiff's burden on this issue. The record contains no evidence that the dunking incident was racial in nature, or that it was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. Therefore, such misconduct is not actionable under Title VII.

As to plaintiff's claim regarding disparate work hours, defendant has failed to meet its burden of showing that there is an absence of any genuine issue of material fact on the issue whether it discriminated against plaintiff on the basis of race when it disci-

8. The Court has difficulty addressing plaintiff's disparate treatment claim for two reasons. First, the pretrial order does not clearly articulate the respects in which plaintiff claims disparate treatment. Second, while defendant has presumably identified the basis for plaintiff's claims through discovery, it has not subjected the disparate treatment claims to conventional analysis under *McDonnell Douglas*. As a result, defendant's motion does not squarely meet the substance of what the Court understands plaintiff's claims to be.

plined him for improper submission of time sheets. Applying the three-pronged framework established in *McDonnell Douglas,* plaintiff establishes a prima facie case of disparate treatment by showing (1) that he is a member of a protected class; (2) that defendant disciplined him for violating a work rule; and (3) that non-minority employees received more lenient discipline for infractions of comparable seriousness. *Elmore v. Capstan, Inc.,* 58 F.3d 525, 529–30 (10th Cir. 1995); *EEOC v. Flasher, Co.,* 986 F.2d 1312, 1316 (10th Cir.1992); *McAlester v. United Air Lines, Inc.,* 851 F.2d 1249, 1260 (10th Cir.1988).

Defendant does not argue that plaintiff has failed to make a prima facie case of disparate treatment under these cases. It merely suggests that defendant's "identical treatment of Walker [as it concerned the chain saw incident] demonstrates that race did not motivate Teaford's decisions regarding plaintiff." Such analysis is shallow and it falls short of convincing the Court that defendant is entitled to judgment as a matter of law on this claim.

### 3. Disparaging or derogatory race-based comments by co-workers

As noted above, plaintiff complains that racial epithets were commonplace in the County road department shop. This is a hostile work environment claim and the law which governs it is set forth above. The record reveals a fundamental problem with plaintiff's claim, however, in that any racial epithets apparently occurred behind plaintiff's back. The record contains no evidence that plaintiff knew of the alleged comments, much less that they were sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. Defendant is therefore entitled to summary judgment on this claim.

### 4. Termination of employment

As noted above, plaintiff claims that defendant terminated his employment effective December 31, 1994, on account of his race. Defendant argues that it is entitled to summary judgment because it terminated three white employees in the same cost-cutting gesture and "the identical treatment of similarly situated white employees refutes any notion that the County's decision to terminate plaintiff was based on race."

To establish a prima facie case of employment discrimination, plaintiff must show (1) that he was a member of a protected class; (2) that he was qualified for the job; (3) that he was terminated despite his qualifications; and (4) that defendant treated similarly situated non-class members more favorably. *James v. Ranch Mart Hardware, Inc.,* 881 F.Supp. 478, 481 (D.Kan.1995). Plaintiff concedes, at least tacitly, that he cannot state a prima facie case under this standard. He asks the Court not apply *McDonnell Douglas,* but rather deny defendant's motion for summary judgment on the basis of direct evidence of discrimination as outlined above. In this regard he places special emphasis on evidence that his supervisor, Pentlin, threatened in reference to plaintiff that he was going to "fire that nigger."

The Court agrees that if Pentlin participated in the decision to terminate plaintiff's employment, his statement constitutes evidence of unlawful intent on the termination issue. Unfortunately for plaintiff, however, such evidence on this record is unrelated to the issue under consideration. As noted above, in order for remarks to be sufficiently probative of discriminatory intent, plaintiff must demonstrate a nexus between the alleged discriminatory statements and defendant's adverse decision. *Rea v. Martin Marietta Corp.,* 29 F.3d at 1457; *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d at 531. In this case, plaintiff has not demonstrated a sufficiently close connection between Pentlin's comment and defendant's decision to suspend plaintiff's temporary position effective December 31, 1994. Plaintiff quite simply cites no evidence that Pentlin had any involvement in the decision. Pentlin's remarks are therefore immaterial in showing that the County's action was based on race discrimination. *See Figures v. Board of Pub. Utils.,* 967 F.2d 357, 360–61 (10th Cir.1992).

## B. Retaliation claim

As noted above, plaintiff claims that on March 10, 1994, he filed his first charge of

discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission and that shortly after defendant received notice of the charge, it retaliated against him by initiating disciplinary action for falsifying time sheets. *Pretrial Order* (Doc. # 28) at 3.

The undisputed evidence is that plaintiff filed a charge of discrimination which the County received on March 14, 1994. To plaintiff's knowledge, no one "punished" him for filing it, but one month later, on April 18, 1994, the County issued plaintiff a written warning for turning in falsified time sheets and advised plaintiff that "if it doesn't stop," plaintiff's employment might be terminated. Less than two weeks later, on May 2, 1994, plaintiff received another written warning for falsifying time sheets—although the time card in question apparently looked like every other time card plaintiff had turned in. This warning cautioned plaintiff that his employment would be terminated if he had another violation on or before December 20, 1994. Viewing the evidence in the light most favorable to plaintiff, Miller corrected time sheets for white employees and defendant never disciplined white employees for turning in a time card that was wrong.

Defendant insists that it is entitled to summary judgment on plaintiff's retaliation claim because plaintiff cannot demonstrate adverse employment action or a causal connection between plaintiff's protected activity and any adverse employment action. *See Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993). Specifically, defendant argues that the two time card warnings were precipitated by "plaintiff's serious misconduct on the job" and that as a matter of law "they cannot be deemed adverse action in this context because plaintiff did not suffer damage as a result." Defendant also argues that the lapse of time between plaintiff's charge of discrimination and plaintiff's termination "renders implausible any causal connection between the two events." The latter argument may be summarily rejected because it is a straw man argument. Plaintiff does not claim that defendant fired him for retaliatory reasons, but that defendant subjected him to retaliatory discipline concerning time card mistakes that defendant corrected or ignored for white employees. Accordingly, we need only address defendant's argument that plaintiff cannot establish "adverse action" because they did not constitute "an ultimate decision" and the warnings were "unrelated to his termination."

In evaluating Title VII retaliation claims, courts have made it clear that " 'not everything that makes an employee unhappy is an actionable adverse action.' " *Jeffries v. Kansas Dep't of Social & Rehabilitation Servs.,* 946 F.Supp. 1556, 1567 (D.Kan.1996) (quoting *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996)); *see also Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707–08 (5th Cir.1997), *cert. denied* — U.S. —, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997) (verbal threat of firing not "ultimate employment decision" and is not "adverse employment action" because it does not "rise above having a mere tangential effect on a possible future employment decision"). Instead, an actionable adverse action is one that affects the " 'terms, privileges, duration, or conditions of employment.' " *Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y. 1993)); *see also* 42 U.S.C. § 2000e–2(a)(1) (making it unlawful to discriminate with respect to "compensation, terms, conditions, or privileges of employment").

By the same token, Title VII, being remedial in nature, should be liberally construed. *See Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1165 (10th Cir.1977). Affording a liberal construction to what constitutes "adverse employment action," the Tenth Circuit Court of Appeals has held that employer conduct which can have "an adverse impact on future employment opportunities" may be an adverse employment action. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996) (prosecution for suspected criminal activity may constitute adverse employment because it can have adverse impact on future employment opportunities). Examples of actionable adverse action include disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of a probationary period. *See Cooper v. Cobe Labs., Inc.,* 743 F.Supp. 1422, 1433 (D.Colo.1990); *Sauers v. Salt*

*Lake County,* 1 F.3d 1122, 1128 (10th Cir. 1993) (transfer or reassignment of duties); *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 (10th Cir.1992) (denial of promotion); *Rutherford v. American Bank of Commerce,* 565 F.2d at 1164 (negative reference by employer who had previously given positive reference); *but see Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994) (evaluation which states that employee "meets expectations" does not constitute adverse action).

Because Pentlin participated in disciplinary decisions which involved employees under his supervision, plaintiff has identified evidence of racial animus that directly bears on the question whether defendant retaliated against him by taking unfounded disciplinary action against him. Also, the approach adopted in *McDonnell Douglas* applies to retaliation claims. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994); *Boyd v. Telecable,* 752 F.Supp. 388 (D.Kan. 1990). Defendant does not deny that plaintiff engaged in protected opposition to discrimination by filing a charge of discrimination. It cannot deny that it issued the time card warnings contemporaneously or subsequent to plaintiff's protected activity, and it does not deny that the timing of those warnings may support an inference of a causal connection between plaintiff's protected activity and its actions. The requirement that plaintiff demonstrate adverse employment action is liberally construed to encompass the sort of conduct alleged in this case. The Court cannot accept, either as a matter of law or of undisputed fact, the argument that defendant's time card warnings to plaintiff were utterly lacking in consequence. When written, defendant obviously intended that they pave the way for what defendant calls an "ultimate employment decision" if plaintiff committed further violations. Defendant evidently expected that the warnings would have more than a merely tangential effect on future employment decisions. While defendant later terminated plaintiff's employment on other grounds, that fact alone cannot exonerate the County from liability for retaliatory conduct that was unlawful (if at all) at the time it occurred. Defendant's argument is more properly addressed to the question of damages than the question of liability, and the Court cannot sustain it as a basis for a summary judgment of non-liability in this case.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment* (Doc. # 29) filed November 25, 1997, be sustained as to plaintiff's claim that defendant refused to consider him for part-time or full-time work; sustained as to plaintiff's hostile work environment claim that a fellow employee tried to dunk him in a water tank; sustained as to plaintiff's hostile work environment claim that fellow employees used racial epithets; and sustained as to plaintiff's claim that defendant terminated his employment effective December 31, 1994, on account of his race.

**IT IS FURTHER ORDERED** that defendant's *Motion For Summary Judgment* (Doc. # 29) filed November 25, 1997, be overruled as to plaintiff's claim that defendant allowed white employees to work but sent him home on short work days; overruled as to plaintiff's claim that defendant disciplined him for time sheet infractions while it did not discipline white employees; and overruled as to plaintiff's claim that it retaliated against him by initiating unfounded disciplinary action for falsifying time sheets shortly after receiving notice of his charge of discrimination.

**IT IS FURTHER ORDERED** that defendant's *Motion To Strike* (Doc. # 38) filed January 26, 1998, be and hereby is overruled as moot.[9]

9. The Court has held that the challenged portions of the Eck, Oliver and Walker affidavits are legally insufficient to defeat defendant's motion for summary judgment. The record suggests no further use to which the affidavits might be put and the motion is therefore moot.