**Jon J. LEIDEL, Plaintiff,**

v.

**AMERIPRIDE SERVICES, INC., d/b/a Ameripride Linen and Apparel Services, Defendant.**

**No. 00–4184–JAR.**

United States District Court,
D. Kansas.

July 24, 2003.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Brenda L. Head, Davis, Unrein, McCallister, Biggs and Head, LLP, Topeka, KS, for Defendant.

### MEMORANDUM AND ORDER

ROBINSON, District Judge.

This matter is before the Court *sua sponte* and on the Court's order for the parties to brief a possible award of back pay and/or front pay damages. On January 28, 2003, the jury returned a verdict in favor of plaintiff in this case. After the verdict was accepted, the Court informed the parties that the back pay and front pay award selected by the jury was only advisory. The Court ordered the parties to file additional briefing regarding the imposition of a back pay and/or a front pay award, and the Court delayed the entry of judgment until this issue was resolved. After consideration of the parties' arguments, the Court finds plaintiff is entitled to an award of back pay as detailed below.

### I. BACKGROUND

On January 21, 2003, this case proceeded to trial on plaintiff's claims of unlawful retaliation and sexual harassment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On January 28, 2003, the jury found that defendant had participated in unlawful retaliation when it terminated plaintiff. The jury, however, rejected plaintiff's sexual harassment claim. Although being fully instructed on its power to grant damages, the jury awarded plaintiff zero damages. The jury was specifically instructed that they could award "lost wages"[1] or back pay and "future damages"[2] or front pay. The Court, therefore, finds itself confronted with a unique situation, in that the jury clearly found a Title VII violation, yet just as clearly, found plaintiff suffered no damages. Although the jury believed no back pay or front pay award was warranted, equitable damages, like back pay and front pay, fall solely within the court's province.[3]

### II. DISCUSSION[4]

#### A. Back Pay

Under Title VII, the court may award a successful plaintiff any appropri-

---

1. The Court instructed the jury that it may "award plaintiff the amount he would have received in his employment with defendant from the date he was discharged, November 24, 1999, until today, minus the amount plaintiff earned from other employment during this period." (Jury Instruction No. 22 attached to Doc. 67).

2. The Court instructed the jury that it may "award plaintiff future damages for wages and other employment benefits the plaintiff would have earned during the period from the date of your verdict through the time when future loss is reasonably certain to be sustained, minus the amount of earnings and benefits plaintiff will receive from other employment during that time." (Jury Instruction No. 22 attached to Doc. 67).

3. Contrary to plaintiff's suggestion, the current proceeding is strictly limited to the issue of a possible award of equitable damages. Any additional arguments presented by the parties have not been considered including

plaintiff's briefing regarding attorneys' fees. Thus, defendant's motion to strike the portions of plaintiff's brief concerning attorney's fees is granted. The Court also notes that plaintiff's attorneys' fee request does not even remotely comply with D. Kan. Rule 54.2. The Court therefore refers the parties to D. Kan. Rule 54.2 for the proper procedure for filing a motion for attorney's fees. If counsel cannot reach an agreement regarding attorney's fees, they should file the statement of consultation and any supplement or further response to the supplemental submission as required by the local rule.

4. As a preliminary matter, the Court will only consider evidence presented at trial. The Court will not consider the affidavit filed by plaintiff in support of his brief for equitable damages. Thus, defendant's motion to strike plaintiff's affidavit in support of his brief shall be granted.

ate relief, including reinstatement, back pay, or "any other equitable relief" the court deems appropriate.[5] If liability is established, back pay should generally be awarded absent unusual circumstances.[6] The amount of back pay awarded to a Title VII plaintiff is committed to the sound discretion of the district court.[7] The Court disagrees with the jury in this case and finds plaintiff has suffered an injury addressable by the equitable power vested in the Court under Title VII.

Generally, the court examines the total salary lost during the appropriate recovery period,[8] and then reduces this amount by the actual (or contemplated) earnings compiled by the plaintiff during the recovery period. Such offset is critical to ensure the plaintiff is made whole but does not receive a windfall.

 While a successful plaintiff may be entitled to an award of back pay, a plaintiff must make a reasonable and good-faith effort to mitigate his damages.[9] This mitigation usually takes the form of replacement employment.[10] The defendant-employer bears the burden of showing that the plaintiff failed to mitigate his or her damages.[11] The Tenth Circuit has held that a defendant-employer may meet its burden by showing: "(1) that the damage suffered by plaintiff could have been avoided, i.e., that there were suitable positions available which plaintiff could have discovered and for which [he or she] was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position."[12] A claimant's failure to search for alternative work, his refusal to accept substantially equivalent employment, or his voluntary quitting of alternative employment without good cause demonstrate a failure to mitigate damages.[13]

---

**5.** 42 U.S.C. § 2000e–5(g)(1).

**6.** *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–21, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**7.** *Daniel v. Loveridge,* 32 F.3d 1472, 1477 (10th Cir.1994); *Whatley v. Skaggs Cos.,* 707 F.2d 1129, 1138 (10th Cir.1983).

**8.** The proper definition of the "appropriate recovery period" has been a matter of debate in current case law. Some courts calculate back pay using the "aggregate method"; that is, subtracting all of the plaintiff's earnings from the date of termination to the date of trial from what the plaintiff would have earned had he never been fired by defendant. The Tenth Circuit, along with many other courts, has recently approved the "periodic method" of calculating back pay. *See Godinet v. Management & Training Corp.,* 2003 WL 42505, *5–6 (10th Cir. Jan. 7, 2003) (citing *Darnell v. City of Jasper, Alabama,* 730 F.2d 653, 656–57 (11th Cir.1984) (applying periodic basis under Title VII); *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1567 (D.Kan. 1995) (same); *Hartman v. Duffey,* 8 F.Supp.2d 1, 6 (D.D.C.1998) (noting "periodic mitigation is the preferred method for determining back pay liability in discrimination cases")). Using the periodic method, the Court calculates back pay in weekly, monthly, or quarterly intervals. In the instant case, the Court will calculate plaintiff's back pay using the periodic method.

**9.** *Acrey v. American Sheep Indus. Ass'n,* 981 F.2d 1569, 1576 (10th Cir.1992); *Spulak v. K Mart Corp.,* 894 F.2d 1150, 1158 (10th Cir. 1990).

**10.** *See* 42 U.S.C. § 2000e–5(g)(1) (amounts earnable with reasonable diligence reduce back pay allowable).

**11.** *Spulak,* 894 F.2d at 1158.

**12.** *EEOC v. Sandia Corp.,* 639 F.2d 600, 627 (10th Cir.1980) (internal citation and quotation marks omitted). *See also Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (opining that a Title VII plaintiff's duty to mitigate does not require the plaintiff "go into another line of work, accept a demotion, or take a demeaning position" but failure to accept a job substantially similar to the one he was denied by the defendant will amount to failure to mitigate).

**13.** *NLRB v. Laredo Packing Co.,* 730 F.2d 405, 407 (5th Cir.1984); *Volkman v. United Transp. Union,* 826 F.Supp. 1253, 1258 (D.Kan.1993).

■ In calculating plaintiff's back pay award, the Court must first determine plaintiff's historic earnings while he was employed with the defendant. Plaintiff began his employment with defendant on January 4, 1999 and was terminated on November 24, 1999. During that period plaintiff was paid $34,788.00. Plaintiff received an additional payment of $3,904.14 in commissions from defendant in the year 2000. Although plaintiff received the payment in 2000, he actually earned the commissions in the year 1999. Thus, the Court finds that plaintiff's historic earnings while he was employed with defendant were $38,692.14, or approximately $832.09 [14] per week.

As for the years 2000, 2001, and 2002, plaintiff claims that his back pay award should be calculated based on the amount Steve Filley, another salesman, earned during the year 2000. Mr. Filley testified at trial that he earned over $80,000 in salary and commissions for the year 2000. Plaintiff claims he and Mr. Filley were comparable salesmen so he would have had similar earnings. The Court declines to indulge in the speculation that plaintiff would have earned the same amount as Mr. Filley in the years following 1999. Mr. Filley was a seasoned salesman who had been with the company for over twenty years. Also, Mr. Filley testified at trial

that he "got very lucky on some big accounts" in the year 2000. Furthermore, plaintiff testified that in August of 1999, his position changed from Sales Representative, like Mr. Filley, to Account Development Representative, a position subject to a different rate of pay and commission schedule. Therefore, plaintiff's back pay award will be calculated based on his historic earnings at Ameripride, not on the earnings of Mr. Filley.

### 1. 1999

■ Plaintiff was fired from his employment with Ameripride on November 24, 1999. For the remaining weeks of 1999, plaintiff contends he is entitled to receive his salary and the value of a trip to South Carolina that he would have won had he not been fired. Additionally, plaintiff asserts that he lost the opportunity to sell about five to ten accounts in 1999, resulting in a loss of commissions in the amount of $5,000 to $10,000 for the year. Although the Court declines to indulge in the speculation that plaintiff may have sold five to ten accounts in the remaining weeks of 1999 [15] or that he would have won the trip to South Carolina,[16] plaintiff should be compensated for what he would have earned, based on his historic earnings, had he not been fired. In making this findings, the Court notes that defendant failed to carry its burden regarding

---

14. The Court arrived at this number by dividing plaintiff's total earnings by the number of weeks plaintiff was employed at Ameripride (46.5).

15. Plaintiff presented no evidence indicating how many accounts he sold on average per week or per month and how much each account paid in commissions. Thus, a finding that plaintiff would have sold five to ten accounts and earned an additional $5,000 to $10,000 in 1999 would be entirely speculative. Furthermore, calculating plaintiff's back pay on his historic earnings is presumably inclusive of the average income he received from commissions.

16. During 1999, Ameripride ran an incentive program called "Raising the Bar" wherein the top two sales persons in the Topeka office would accompany Troy Harrison, the sales manager, to South Carolina for a conference. At trial, the evidence showed that over the course of the year, plaintiff was second only to Steve Filley for receiving the trip to South Carolina. Defendant's trial exhibit 117, indicates that as of November 3, 1999, plaintiff and Steve Filley would have received the trip. The exhibit also showed that Ken Musfelt, was quickly gaining on plaintiff and very well could have caught him in the remaining two months of the year.

its mitigation defense for the weeks following plaintiff's termination. Plaintiff testified that he quickly began looking for work consisting of putting in approximately three to five applications per week. Accordingly, plaintiff is entitled to $4,576.50 in back pay for the remaining 5.5 weeks of 1999.[17]

## 2. 2000

For the year 2000, plaintiff contends that he is entitled to a back pay award consisting of the difference between what he would have earned at Ameripride[18] and what he actually earned at Logan Business Machines, Inc., the replacement employment plaintiff found approximately seven months after being fired from Ameripride. Defendant contends that plaintiff is not entitled to any back pay for 2000 because his income over the course of the year far exceeded what he would have earned had he remained employed with Ameripride. In 2000, plaintiff earned a total of $22,477.20 from Logan Business Machines. Plaintiff also received, $4,643.00 from the State of Kansas in unemployment benefits, $43,963.25 from Basic Carbide, and $5,400 in self-employment income from a deck-washing service. Plaintiff contends that his income from sources other than Logan Business Machines was collateral income

and should not be used to reduce his back pay award. The Court agrees.

Deduction of collateral sources of income from a back pay award is a matter within the trial court's discretion.[19] It is clear that unemployment compensation is a collateral source of income and should not be used to offset a back pay award.[20] As to plaintiff's self-employment income from deck washing, plaintiff testified at trial that this was a "moonlight" job or one that he did after hours or on weekends. Interim earnings from second or "moonlighting" jobs are also generally not deducted from a back pay award because an employee could have held such a job and retained those earnings even if his or her primary employment had been with the defendant who is ordered to pay back pay.[21] Plaintiff's income from Basic Carbide also should not be deducted from the back pay award. Defendant is not entitled to any offset for earnings from plaintiff's secondary income inasmuch as plaintiff proved to the Court's satisfaction that he could have achieved these earnings in addition to any earnings he could have made had he not been fired by defendant. In this case, plaintiff's uncontroverted testimony indicated that plaintiff's income from Basic Carbide would have been earned in addition to the income he received from

17. The Court arrived at this number by multiplying the number of weeks plaintiff was out of work in 1999(5.5) by plaintiff's historic weekly earnings ($832.09).

18. Plaintiff argues he would have earned approximately $80,000 at Ameripride in 2000. As discussed above, the Court rejects plaintiff's argument.

19. *EEOC v. Sandia Corp.,* 639 F.2d 600, 624–26 (10th Cir.1980).

20. *Sandia Corp.,* 639 F.2d at 625–26 (holding that unemployment compensation is a collateral source and is not required to be offset against the amounts received as back pay under the Age Discrimination in Employment

Act); *Cooper v. Cobe Laboratories, Inc.,* 743 F.Supp. 1422, 1435 (D.Colo.1990) (following the rule that unemployment benefits should not reduce back pay award).

21. *Whatley v. Skaggs Companies, Inc.,* 707 F.2d 1129, 1139 (10th Cir.1983) ("Moonlighting earnings will be considered 'interim' earnings and offset against a successful plaintiff's back pay award if he would have been unable to hold the moonlighting job at the same time as the job he lost" through defendant's discriminatory conduct.) *Accord, Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1111–12 (8th Cir.1994) (defendant "had the burden of proving that [plaintiff] could not have earned the income had he not been terminated").

Ameripride. Plaintiff testified that he sold the Basic Carbide account approximately ten years ago and continues to receive commissions from the account so long as the customer continues to place orders.

Defendant also otherwise failed to meet is burden regarding its mitigation defense for the year 2000. Defendant produced no evidence to satisfy its burden of demonstrating that during this time, employment opportunities were available to plaintiff but were not diligently pursued. Plaintiff testified that he promptly began looking for employment by applying for three to five jobs per week. Thus, the Court finds that plaintiff is entitled to a back pay award, not to be offset by earnings other than those from Logan Business Machines, for the year 2000.

In calculating plaintiff's back pay award for 2000, the Court must first determine what plaintiff's yearly salary would have been had he not been fired by defendant. Based on plaintiff's historic earning at Ameripride, the Court determined plaintiff's weekly salary was $832.09. Accordingly, plaintiff's yearly salary at Ameripride would have been $43,268.68.[22] Subtracting $22,477.20, the sum plaintiff actually received in replacement employment in 2000, from $43,268.68, the Court finds plaintiff is entitled to $20,791.48 in back pay for the year 2000.

### 3. 2001

In 2001, plaintiff continued his employment with Logan Business Machines, earning $40,910.76. In addition, plaintiff earned $1,602.15 from Sharp Electronics Corporation and $28,621.50 from Basic

Carbide. Plaintiff does not suggest that his earnings from Sharp Electronics should not offset the back pay award, and once again, the Court finds plaintiff's income from Basic Carbide should not be deducted from the back pay award. Subtracting $42,512.91, the sum plaintiff actually received in replacement employment in 2001, from $43,268.68, the sum plaintiff would have earned had he been employed at Ameripride, the Court finds plaintiff is entitled to $755.77 in back pay for the year 2001.

### 4. 2002

In 2002, the evidence presented at trial showed that plaintiff worked for Logan Business Machines, earning $6,668.00, until he quit to take a position with Image Pro Digital. Plaintiff testified that he went to work for Image Pro Digital because he believed he would make more money. Plaintiff worked at Image Pro Digital, earning $13,987.36 until he voluntarily quit in August of 2002.[23] Plaintiff testified that he quit his job with Image Pro Digital because he had a dispute with the management concerning compensation. Plaintiff further testified that he attempted to find employment after leaving Image Pro Digital, but he remained unemployed up to the trial in January of 2003.

The Court declines to grant a back pay award from the time plaintiff quit his job with Image Pro Digital until the time of trial. The duty to mitigate damages includes the obligation to make "reasonable and good faith efforts" to maintain suitable replacement employment once it has been found.[24] When a Title VII claim-

---

**22.** The Court reached this number by multiplying plaintiff's weekly salary by 52 weeks.

**23.** In determining the back pay award for 2002, the Court will consider August 1, 2002 as the date in which plaintiff quit his job with Image Pro Digital. Plaintiff testified that he quit in 2002, but he did not give a date

specific. Because it is plaintiff's burden to prove his back pay losses, the Court will err on the side of defendant.

**24.** *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1277 (4th Cir.1985) (citing *Ford,* 458 U.S. at 232, 102 S.Ct. 3057).

ant voluntarily terminates suitable interim employment without compelling reasons, he has freely chosen to incur a loss of earnings, thereby failing to use reasonable diligence in the mitigation of damages.[25] The Court finds it was unreasonable for plaintiff to voluntarily quit his job with Image Pro Digital without having secured replacement employment and then remain unemployed to the date of trial.[26]

■ In contrast, plaintiff's decision to leave Logan Business Machines for what he thought was a higher paying job cannot be considered a failure to mitigate dam-ages.[27] Thus, the Court finds plaintiff is entitled to back pay calculated by subtracting what he earned at Logan Business Machines and Image Pro Digital, $20,655.36, from what he would have earned in the first seven months of 2002 at Ameripride had he not been fired, $25,378.75,[28] for a total of $4,723.39.

To summarize the Court's findings regarding plaintiff's back pay award, the Court constructs the following table which compares the salary plaintiff would have earned at Ameripride with the salary he did in fact earn in subsequent employment:

| | Continued at Ameripride | Actual Income | Loss |
|---|---|---|---|
| 1999 (11/25–12/31) | $ 4,576.50 | $0 | ($ 4,576.50) |
| 2000 | $43,268.68 | $22,477.20 | ($20,791.48) |
| 2001 | $43,268.68 | $42,512.91 | ($ 755.77) |
| 2002 (1/1–8/1) | $25,378.75 | $20,655.36 | ($ 4,723.39) |
| Total Loss | | | ($30,847.14) |

Based on the above table, the Court finds plaintiff is entitled to an award of back pay damages in the amount of $30,847.14.

**B. Front Pay**

In the pretrial order entered in this case, plaintiff seeks five years of wages from defendant. Because the trial took place approximately three years after plaintiff's termination, it appears that plaintiff seeks approximately two years of front pay. After reviewing the record, the Court finds that an award of front pay in not appropriate in this case.

■ Under Title VII, the court may, in its discretion, award a successful plaintiff front pay.[29] The award of future wages is designed to compensate the plaintiff for any economic loss from the date of trial until a date certain in the future when such loss is wiped out.[30] "In determining

---

**25.** *Id.*

**26.** *See E.E.O.C. v. Riss International Corp.,* No. 76–CV–560–W–6, 1982 WL 277, *2 (W.D.Mo. March 29, 1982) (holding that leaving subsequent employment for personal reasons such as not getting a promised promotion "cannot be considered reasonable for purposes of mitigation of damages when no other job was lined up prior to quitting or was obtained within a reasonable time.")

**27.** *See Riss International,* 1982 WL 277, *2.

**28.** From January 1, 2002 to August 1, 2002, there were 30.5 weeks. Thus, the Court multiplied what would have been plaintiff's week-ly salary at Ameripride, $832.09, by 30.5 weeks to arrive at this number.

**29.** *See Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980); *see also Daneshvar v. Graphic Technology, Inc.,* 40 F.Supp.2d 1225, 1240–41 (D.Kan.1998).

**30.** *See Carter v. Sedgwick County, Kansas,* 929 F.2d 1501, 1505 (10th Cir.1991) ("In light of the remedial purpose of Title VII, an award of front pay should be limited to the amount required to compensate a victim for the continuing future effects of discrimination until the victim can be made whole.") (*citing Pitre v. Western Electric Co., Inc.,* 843 F.2d 1262 at 1278).

whether, and how much, front pay is appropriate, the district court 'must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall.' " [31]

 In its discretion, the Court declines to grant plaintiff an award of front pay.[32] Plaintiff was able to find comparable employment on two occasions after he was terminated by defendant (Image Pro Digital and Logan Business Machines) but chose to quit both jobs. Like a plaintiff seeking back pay, a plaintiff claiming front pay also has the duty to take reasonable steps to mitigate his damages.[33] As noted above, failure to maintain adequate replacement employment after it has been located constitutes failure to mitigate damages. Accordingly, the Court finds plaintiff has failed to reasonably mitigate front pay damages and he is therefore not entitled to a front pay award.

### C. Interest

 Plaintiff seeks prejudgment interest on the back pay award. The purpose of prejudgment interest "is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." [34] Withholding an interest award would allow defendant to enjoy an interest-free loan in the amount of plaintiff's damages. Therefore, the Court finds plaintiff is entitled to prejudgment interest on his back pay award.

 The rate of prejudgment interest rests within the sound discretion of the trial court.[35] After reviewing various interest rates employed by courts in this district as well as courts in other districts, the Court finds the rate set by the Internal Revenue Service on overpayments and underpayments most accurately reflects the economic reality of the last several years.[36] The Court additionally finds that the interest should be compounded annually.[37]

The following interest rates were in effect for the applicable periods of time: for 2000, the average annualized rate was 8.989%; for 2001, the average annualize rate was 7.945%; for 2002, the rate was 6%; and for 2003, the rate is set at 5%. Based on these rates, plaintiff is entitled to prejudgment interest in the amount of

31. *See Mason v. Oklahoma Turnpike Auth.,* 115 F.3d 1442, 1458 (10th Cir.1997) (*quoting Standley v. Chilhowee R–IV School District,* 5 F.3d 319, 322 (8th Cir.1993)).

32. *Carter v. Sedgwick County,* 929 F.2d 1501, 1505 (10th Cir.1991) ("Decisions concerning front pay under Title VII fall within the trial court's discretion.")

33. *See Spulak v. K Mart Corp.,* 894 F.2d 1150, 1158 (10th Cir.1990); *Hughes v. Regents of Univ. of Colorado,* 967 F.Supp. 431, 439 (D.Colo.1996).

34. *Greene v. Safeway Stores, Inc.,* 210 F.3d 1237, 1247 (10th Cir.2000) (citations and quotations omitted).

35. *Kleier Advertising, Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1042 n. 4 (10th Cir. 1990); *Daniel v. Loveridge,* 32 F.3d 1472, 1478 (10th Cir.1994) (court authorized under Title VII to grant prejudgment interest on back pay).

36. *See* 26 U.S.C. § 6621. See the following examples for cases in which the Internal Revenue Service rate, computed under 26 U.S.C. § 6621, was employed: *EEOC v. Guardian Pools, Inc.,* 828 F.2d 1507 (11th Cir.1987); *EEOC v. Regency Architectural Metals Corp.,* 896 F.Supp. 260 (D.C.Conn.1995), *Frazier v. Southeastern Pa. Transp. Auth.,* 814 F.Supp. 11 (E.D.Pa.1993), *Miller v. Swissre Holding, Inc.,* 771 F.Supp. 56 (S.D.N.Y.1991), *Amos v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints,* 618 F.Supp. 1013 (D.C.Utah.1985).

37. Although the Internal Revenue Service allows for daily compounding of interest, the court finds yearly compounding more accurately reflects plaintiff's losses.

$5,287.08, calculated as follows: plaintiff incurred a $4,576.50 loss by December 31, 1999, with interest accruing beginning January 1, 2000. Therefore, in calendar year 2000, plaintiff's prejudgment interest is $411.38, derived by multiplying $4,576.50 by 8.989%. Because the interest is compounded, plaintiff's prejudgment interest in 2001 is $2,048.17, derived by multiplying $25,779.36 (the sum of plaintiff's losses accrued in 2000 and 2001 plus the interest accrued in 2000) by 7.945%. In 2002, plaintiff's prejudgment interest is $1,833.07. This amount was derived by combining the prejudgment interest earned between January 1, 2002 and July 31, 2002 with the interest earned between August 1, 2002, the date plaintiff self-terminated from Image Pro Digital, and December 31, 2002. In 2003, the interest is computed only through the date of the judgment, July 24. Therefore, between January 1, 2003 and July 24, 2003, plaintiff is entitled to $994.42 in interest. Total interest is derived by adding together, $411.38; $2,048.17; $1,833.07; and $994.42. Accordingly, the Court finds judgment entered in this case should include an award of $5,287.04 in prejudgment interest.

 Plaintiff further requests the court to award postjudgment interest. By ordering postjudgment interest, the court achieves the statutory goal of compensating the plaintiff while removing defendant's incentive to delay payment of the judgment. Under federal law, effective October 1, 1982, interest on a money judgment recovered in a civil case in a district court is calculated

> at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.[38]

38. *See* 28 U.S.C. § 1961(a).

The judgment in this case will be entered on July 24, 2003. Therefore, the postjudgment interest on plaintiff's award is to be calculated at the rate provided by 28 U.S.C. § 1961(a), compounded annually, from July 24, 2003 through the date of payment.

**IT IS THEREFORE ORDERED** defendant's motion to strike (Doc. 73) is granted.

**IT IS FURTHER ORDERED** that judgment in favor of plaintiff on his Title VII retaliation claim be entered in this case as follows:

| | |
|---|---|
| Back pay: | $30,847.14 |
| Prejudgment Interest: | $ 5,287.04 |
| **TOTAL** | **$36,134.18** |